## LEWIS *v.* ACCELERATED TRANSPORT-PONY EXPRESS, INC.

[No. 134, September Term, 1958.]

*Decided March 13, 1959.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ., and HENRY, JR., Chief Judge of the First Judicial Circuit, specially assigned.

*William J. Dwyer* and *Edward J. Ryan,* with whom was *William J. Wilson* on the brief, for appellant.

*W. Warren Stultz* and *Francis H. Urner,* with whom were *Urner, Sweeney and Stultz* on the brief, for appellee.

PRESCOTT, J., delivered the opinion of the Court.

This is an appeal from a judgment *n.o.v.* in favor of the appellee, defendant below, after a verdict had been found by the jury for the appellant-plaintiff. The action was for slander and a verdict was returned against the appellee and its employee, who was alleged to have spoken the slanderous words. Because of errors in its instructions to the jury, the court, of its own volition, ordered that the verdicts be stricken and a new trial granted. The appellee, alone, filed a motion for a judgment *n.o.v.,* and the court, having reserved its decision on a motion by the appellee for a directed verdict

(Maryland Rule 563 a 2), entered a judgment *n.o.v.* in favor of the appellee. From this judgment, the plaintiff below has appealed.

In 1956, Robert Broderick was the Safety Supervisor for the appellee, Accelerated Transport-Pony Express, Inc. In July of that year Mr. Broderick called at the place of business of the appellant, Cecil E. Lewis, which is known as "Whitey's Truck Stop" and is located a few miles from Oakland, Maryland. Lewis at that time had a business arrangement with Broderick's employer, the appellee, to service equipment owned by that company, store and install truck tires and other related services. Uncontradicted testimony indicated that Broderick urged Lewis to enter into a "shakedown" arrangement with him at the expense of Broderick's employer. When Lewis refused, Broderick threatened reprisals and was able to use his official position with his employer to assist in having Whitey's Truck Stop placed "off limits" to all of the appellee's drivers and causing the company to rescind its business arrangement with Lewis.

In October, 1956, a driver named Kennedy was accused of having stopped at Whitey's Truck Stop in violation of the "off limits" order of the company. For this violation of rules, he was given a suspension. The other drivers, thinking the length of the suspension was unwarranted, indicated they were not "going out" that night and were going to stage a protest meeting. J. Edward Davey, President of the appellee, and his Director of Operations invited the drivers into Mr. Davey's office. According to the testimony, Broderick came in after the meeting had started. Witnesses place him at various places in the room but all agree that his remarks were heard generally throughout the gathering.

Between 50 and 80 drivers attended the meeting. It was called by Davey primarily to persuade the men to "go out" that night on their respective trips. The main grievance that was holding up the normal operations of the company was the suspension of Kennedy. During the course of the discussion, someone asked why Whitey's Truck Stop was "off limits," and Broderick loudly stated that it was "nothing but a whore-house." The president of the appellee admitted hear-

ing the remark, but made no effort to repudiate or contradict it.

The parties concede that the words are slanderous *per se*.

The granting of the appellee's motion for a judgment *n.o.v.* was, in effect, a granting of its previous motion for a directed verdict; hence it is our duty to determine whether the evidence and the reasonable and proper inferences to be drawn therefrom were sufficient to require the submission to the jury of the issue as to whether Broderick was acting within the scope of his employment at the time the slanderous words were uttered by him.

It will be unnecessary here to discuss the ancient law, when, because of the lack of body, mind or soul, it was held that a corporation was incapable of committing a tort or a crime. This old doctrine has been completely repudiated in modern jurisprudence. In *Hopkins C. Co. v. Read Drug & C. Co.,* 124 Md. 210, 92 A. 478, this Court stated that a corporation is liable for the slanderous words of its employees if such words were acts within the scope of the employee's employment. In that case, the Court, quoting with approval from the case of *Sawyer v. Railroad,* 142 N. C. 1, 54 S. E. 793, said: "The simple test is whether they were acts within the scope of his employment; not whether they were done while prosecuting the master's business, but whether they were done by the servant in furtherance thereof, and were such as may fairly be said to have been authorized by him. By 'authorized' is not meant authority expressly conferred, but whether the act was such as was incident to the performance of the duties entrusted to him by the master, even though in opposition to his express and positive orders."

In the later case of *West v. F. W. Woolworth Co.,* 215 N. C. 211, 1 S. E. 2d 546 (N. C. 1939), the rule was stated thus:

> "An act is within the scope of the servant's employment where necessary to accomplish the purpose of his employment and intended for that purpose, although in excess of the powers actually conferred upon the servant by the master. That the act was

committed while the servant was on duty performing the functions of his employment and it was committed for the purpose of furthering the business of the master, rather than its method of performance, is the test of employment. When a wrong is committed by an employee in performing or attempting to perform the duties and functions of his employment it is immaterial whether the injury was a result of negligence or willful and wanton conduct; nor is it necessary that the master should have known that the particular act was to be done. * * * The question of liability does not depend on the quality of the act, but rather upon the question whether it has been performed in the line of duty and within the scope of the authority conferred by the master."

And this is the law generally. See Anno. 150 A. L. R. 1346.

In the *Read* case, *supra,* 124 Md. at page 214, it was also pointed out that the question as to whether an act is within the scope of a servant's employment is generally one of fact for the jury, with the burden being on the defendant to show that the servant was not engaged in the course of his employment;[1] but, under proper circumstances, the question of an act being within the scope of an employee's employment may become one of law.

We think that the undisputed and uncontroverted testimony in this case (principally as related by the president of the appellee) raised at least a jury question as to whether Broderick, when he spoke the words complained of, was acting within the scope of his employment. He was employed by the appellee as its Supervisor of Safety. He was attending a meeting that had as its principal object persuading the drivers to proceed immediately with his employer's business —to "go out" that night. The main controversy that was delaying the drivers from starting on their respective routes was that they thought that Kennedy had been unjustly treated by the appellee for stopping at Whitey's Truck Stop. When

---

1. See also *Jones v. Sherwood Distilling Co.,* 150 Md. 24, 32, 132 A. 278. Cf. *Julian Goldman Stores v. Bugg,* 156 Md. 36, 39, 143 A. 589.

the question was asked as to why Whitey's Truck Stop had been placed "off limits," Broderick's answer, the slanderous words uttered in the presence and within the hearing of the appellee's president, was an attempt to justify the company's previous action and to palliate the aroused feelings of the drivers, in order to get them to return to the employer's business as soon as possible. We, therefore, hold that the trial court was not in error when it submitted the case to the jury on this question.

The appellant also argues that the facts adduced at the trial below disclosed that the action of Broderick in speaking the slanderous words was *ratified* by his corporate employer. This question, however, is not before us: it is not mentioned in the declaration, the court's charge to the jury (to which there were no objections), nor in the court's opinion in ruling upon the motion for judgment *n.o.v.* Maryland Rule 885.

Ordinarily, in the posture in which the case now presents itself, we would reverse the judgment *n.o.v.* and reinstate the judgment in favor of the plaintiff in an amount not to exceed the sum claimed in the narr; but, due to the fact that the trial court, *sua sponte,* stated that it had committed certain errors in its instructions to the jury and has, on its own initiative, granted the other defendant a new trial, we shall, under the authority of Maryland Rule 871 remand the case, without an affirmance or reversal, for a new trial as to both defendants.

> *Case remanded without affirmance or reversal, the appellee to pay the costs.*