## DRUG FAIR OF MARYLAND, INC.
## *v.* SMITH

[No. 50, September Term, 1971.]

*Decided November 10, 1971.*

342

The cause was argued before HAMMOND, C. J., and BARNES, FINAN, SINGLEY and DIGGES, JJ.

*Joseph D. Montedonico, Jr.,* with whom were *Donahue & Ehrmantraut* on the brief, for appellant.

*Kenneth E. Conklin,* with whom were *William R. Noble* and *Conklin & Noble* and *David Davenport* and *Roman, Davenport & Bean* on the brief, for appellee.

DIGGES, J., delivered the opinion of the Court.

The appeal here is from the Circuit Court for Montgomery County (Moorman, J.) where, following a jury's verdict, a judgment for $60,000 was entered against appellant, Drug Fair of Maryland, Inc. David A. Smith, appellee, brought this action for assault and battery, false imprisonment, and malicious prosecution.

On May 1, 1969 Mr. Smith, his wife Josephine and their three year old daughter Adriana, visited his parents in Chevy Chase, Maryland. He was barefooted, wearing levis, a sweater and a T-shirt because he planned, while there, to wash his car. They stayed at his parents for dinner and then shortly after 10:00 p.m. left for their own home. On the way, remembering they needed some milk for their daughter, they stopped at the all-night Drug Fair on Georgia Avenue where Smith, mo-

mentarily leaving his family in the car, went in for it. What transpired once appellee was in that store is the basis of this controversy and each party offers a different version of the facts. Mr. Smith says that upon entering the drug store he noticed a group of people as he made his way toward the milk counter. About half-way there his arm was suddenly grabbed from the rear and instinctively he pulled free but was again grabbed and eventually wound up the victim of a hammerlock. For the first time the person behind identified himself as a Montgomery County police officer and informed appellee that he was under arrest for assault and battery. The officer, William Hess, then pushed Smith toward the rear wall and thoroughly searched him as he was standing in broken glass. He protested this treatment but was told by Hess to "shut up" or a .44 magnum pistol would be used on him; he was then handcuffed and detained, pending the arrival of the police. The appellee further claimed that during this incident a number of people were laughing and making derisive comments about the whole affair.

Drug Fair through its witnesses related the same incident in a different manner. It claims that when appellee entered the store on May 1 he was told by the assistant manager, Richard E. Jackson, that he would not be permitted to stay without shoes. Smith replied that he was "just going to buy a half-gallon of milk and would get right out." The admonition was repeated but disregarded and Smith continued toward the milk counter. Mr. Jackson then summoned Hess, a part-time night clerk at the store and told him to remove the intruder. The clerk, who was also a regular Montgomery County policeman, approached the appellee, identified himself and asked the prospective customer to leave the premises. Hess admits he grabbed Smith's arm in an effort to usher him out the door "as you would a lady," but as he did so appellee turned around and with his hand struck his escort in the nose. Smith was then put in a hammerlock with Hess applying only as much pressure

as was necessary to subdue him; he was frisked, handcuffed and a few minutes later the police arrived.

As to what happened following the arrival of the police, both parties are in basic agreement. Mr. Smith was taken to the Silver Spring police station where he was presented to the committing magistrate. He was questioned, photographed, fingerprinted, and detained in a holding cell for several hours. He was told he could call a bondsman, but this proved futile since the only one he could contact was playing poker that night and unwilling to come to his aid. The appellee later was transferred to the Montgomery County Detention Center where he spent the rest of the waning night. The next day he was taken to People's Court and finally released on his personal recognizance. Smith then went home, called his supervisor Mr. Buechs, at IBM where he worked, in order to give an explanation for his absence. At this point the facts again are in dispute, with David Smith claiming that upon hearing this gruesome tale his boss informed him that he no longer was employed. Buechs and a general supervisor at IBM, Mr. Hance, both state that appellee was not dismissed but rather voluntarily resigned. In any event as of May 2, 1969 he no longer worked for IBM in a job paying him $475.00 per month. Smith remained unemployed for two weeks and eventually went to work for the Yellow Cab Company. At present he attends the University of Maryland full time and works as a sports car mechanic on the side.

On May 21, Smith went to trial in the People's Court of Montgomery County on the charge of assault and battery. Both Hess and Jackson testified but Judge Miller found the appellee not guilty. Smith then brought this action and a jury awarded him $24,000 in compensatory and $36,000 in punitive damages. From that decision Drug Fair appeals claiming the trial court in several instances committed reversible error.

## I

The first argument the appellant posits for our con-

sideration is whether, as a matter of law, William Hess was a servant of Drug Fair, Inc., acting within the scope of his employment. It is well settled in Maryland and other jurisdictions that a master is liable for the acts of his servant, when such acts are performed with the employer's actual or implied authority. In *Globe Indemnity Co. v. Victill Corp.*, 208 Md. 573, 580, 119 A. 2d 423 (1956) Judge Delaplaine said for the court:

> "In the law of agency, it is the basic general rule that a master is liable for the acts which his servant does with the actual or apparent authority of the master, or which the servant does within the scope of his employment, or which the master ratifies with the knowledge of all the material facts. This rule is founded upon the maxims of the common law, *'qui facit per alium facit per se,'* which indicates the legal identity of the principal and his agent, and *'respondeat superior,'* which indicates the tort liability of the principal. The law considers that the master holds out his servant as competent and fit to be trusted, and thereby he in effect warrants his servant's fidelity and good conduct in all matters within the scope of his employment."

*LePore v. Gulf Oil Corp.*, 237 Md. 591, 207 A. 2d 451 (1965) ; 2 Harper and James, *The Law of Torts,* §§ 26.6-.7 (1956) ; Prosser, *Law of Torts,* Ch. 13 (3d ed. 1964). In the present case, appellant concedes that Mr. Hess was an employee, however, it further contends that the altercation involving him and David Smith was separate from any employment and instead a personal matter between them. Therefore, Drug Fair argues it was error for the trial court to instruct the jury as a matter of law, that Hess was its agent acting within the scope of his employment. It claims there was a factual dispute that should have been resolved by the jury. We recognize that the issue of whether a servant is acting

within the scope of his employment is ordinarily a question for the jury but this is so, only if there is a factual dispute. *Lewis v. Accelerated Express,* 219 Md. 252, 256, 148 A. 2d 783 (1959) ; *Greer Lines Co. v. Roberts,* 216 Md. 69, 80, 139 A. 2d 235 (1958) ; *Hopkins C. Co. v. Read Drug & C. Co.,* 124 Md. 210, 214, 92 A. 478 (1914) ; *cf. Safeway Stores, Inc. v. Barrack,* 210 Md. 168, 173, 122 A. 2d 457 (1956). In the case before us, we do not find a factual dispute as to the scope of Hess' usual duties. It is true that the testimony of Jackson and Hess presented differing descriptions as to what were these duties. However, their testimony, taken together with that of Stanley Horowitz, the corporate secretary of Drug Fair, is not at all contradictory; rather each amplifies the other and produces a more complete picture. With no further clarification Mr. Horowitz at trial said that Hess was employed as a clerk. Mr. Jackson, the assistant manager of the Georgia Avenue Drug Fair, stated that Hess was a clerk and defined his duties as follows: "to help the customers in the store and rearrange the merchandise." Jackson also related that Hess on occasion made night deposits at the bank. Mr. Hess testified that not only was he employed as a clerk, but in addition

> ". . . was hired to attempt to quell some of the shoplifting within the store. It was getting to the point where it was getting out of hand, the company was losing a lot of money in thefts which we did succeed somewhat with several apprehensions, I would say, four to five apprehensions in shoplifting."

We think it is quite doubtful that this evidence presents a factual dispute. However, we are not called upon to lay this issue to rest on that point. Even assuming these statements are conflicting, a jury question is still not presented since appellant's own witness, Hess, has clearly and without contradiction related that he was told by his superior to remove David Smith from the store. He testified:

"The next thing I knew Mr. Jackson came back to me and asked me if I would ask the gentleman to leave the store; that he was being ignored."

This is further confirmed by reference to Hess' written application for a warrant (received in evidence) where he stated that

"upon *request of Richard Jackson,* Assistant Manager of Drug Fair . . . I apprehended . . . David Alan Smith identifying myself as a police officer, told Mr. Smith to leave the store as *requested by Mr. Jackson.*" (Emphasis added.)

Nothing inconsistent with these statements was presented by any other witness, including Jackson himself. It is also clear from the testimony of the corporate secretary that Jackson's directive was in accord with company policy, albeit unwritten, to prohibit persons with bare feet from coming into any Drug Fair store. In this case what we have is the assistant store manager pursuing company policy and when failing, summoning a subordinate to rectify the situation. Nowhere has it been suggested that this was not the factual pattern. Therefore, even with the dubious assumption that originally Hess was a store clerk only, and not a security officer, the fact that his superior instructed certain actions, which were actually performed in his presence, clearly places Hess' subsequent conduct within the scope of his employment. *LePore v. Gulf Oil Corp., supra; Lewis v. Accelerated Express, supra; Hopkins C. Co. v. Read Drug & C. Co., supra.*

The appellant next argues that even if Hess was simply doing his job when he originally approached Smith, what followed this initial encounter, including the subsequent altercation and arrest, was unrelated to his employee duties and therefore, Drug Fair is not liable under the theory of "respondeat superior." This contention is

clearly incorrect. While there are some factual disputes as to what occurred when Smith entered the drug store, there is total agreement that the entire incident took place in one brief and continuous sequence, lasting no more than twenty minutes. At all times Hess was acting at his employer's behest in trying to remove the appellee from the store. There is no way the initial act in which he "took him by the arm, as you would a lady" can be separated from what followed. It all was interrelated to his supervisor's original request, and this being so, these activities are not severable but rather one transaction, all for Drug Fair's express benefit. In *Balto. & Ohio R. Co. v. Strube,* 111 Md. 119, 127-28, 73 A. 697 (1909) with a factual situation akin to the present case, the Court said:

> "In this case both the arrest and the assault occurred . . . as part of one and the same transaction, apparently within the space of a very few moments of time, and it would not do under such circumstances for the Court to say or submit to the jury to say, that immediately after putting his hands on Strube and saying 'I am going to put you under arrest,' that thereafter McCarron ceased to be an employee of the defendant and became merely an officer of the State.
>
> If McCarron was acting within the scope of his employment in making the arrest, the defendant would be responsible even if McCarron acted maliciously or wilfully in committing the assault, because the whole occurrence was but one transaction.
>
>    .   .   .
>
> In this case the arrest and the assault must be treated as so merged together into one transaction as to be scarcely separable for practical purposes, even though theoretically they could possibly be regarded as distinct acts."

We arrive at the same conclusion in the present case. As we said in *Lewis v. Accelerated Express, supra,* quoting from *Hopkins C. Co. v. Read Drug & C. Co., supra* at 255: "The simple test is whether they were acts within the scope of his employment; not whether they were done while prosecuting the master's business, but whether they were done by the servant in *furtherance thereof, and were such as may fairly be said to be authorized by him.*" (Emphasis added.)

The appellant further contends, that since the detention of Smith by Hess solely resulted from a misdemeanor being committed in the presence of a policeman which justified the arrest, that a jury question was presented as to whether Hess was acting as Drug Fair's servant. Again we must disagree. It is true that Hess, as a policeman, can make an arrest without a warrant for a misdemeanor committed in his presence. *Davids v. State,* 208 Md. 377, 384, 118 A. 2d 636 (1955). However, here he was not acting as a policeman when he detained Smith. In his testimony, at the questioning of Drug Fair's attorney, Hess explicitly related the capacity in which he acted on that fateful night of May 1:

"REDIRECT EXAMINATION

. . .

Q. Mr. Hess, I believe you indicated to His Honor and the ladies and gentlemen of the jury on cross-examination here that you were filing or making a citizen's arrest of Mr. Smith for the assault and battery on you; is that correct?
A. That is correct.
Q. What is that? What do you mean by that?
A. In this county a police officer — there are two types of applications for a warrant; one is an application for warrant by a police officer; the other is the application that is used by the average citizen that may go in and apply for a warrant.
This warrant was obtained on the application

that a citizen would use because the assault was on me.

Q. And what probable cause or cause did you feel you had to make an arrest on Mr. Smith?
A. The man hit me in the nose.

.   .   .

### RECROSS EXAMINATION

Q. You stated that this is an application for arrest used by a citizen? A. Yes.

Q. An employee of Drug Fair not being a police officer would also have to use this particular application for a warrant; would he not?
A. That is correct.

Q. You were working for Drug Fair at this time this incident happened; is that correct?
A. At that time, yes.

.   .   .

Q. Mr. Jackson, the assistant manager of Drug Fair, told you to remove David Smith from Drug Fair; did he not? A. Yes, he did."

Certainly from these responses we could not possibly conclude that Mr. Hess was acting as a policeman when he specifically and unequivocally stated he was not. We therefore find no error in the trial court's determination, as a matter of law, that Hess was acting as an employee of the appellant.

## II

Drug Fair claims error was committed when the trial judge failed to instruct the jury that it must find *actual* malice before awarding punitive damages. Appellant correctly accepts the general rule, applicable to all personal injury cases, that if the injuries are "inflicted maliciously and wantonly, the jury is not restricted to actual or compensatory damages but may give in addition thereto such punitive or exemplary damages as the circumstances of the case will warrant." *Galusca v. Dodd*, 189 Md. 666, 670, 57 A. 2d 313 (1948). However, rely-

ing on prior decisions of this Court appellant then concludes that such an award can only result if actual, not implied, malice is proved. *Dennis v. Baltimore Transit Co.*, 189 Md. 610, 56 A. 2d 813 (1948) (wrongful ejection and false imprisonment); *Heinze v. Murphy*, 180 Md. 423, 24 A. 2d 917 (1942) (assault and false imprisonment); *Knickerbocker Co. v. Gardiner Co.*, 107 Md. 556, 69 A. 405 (1908) (wrongful interference with contract) and *Bernheimer v. Becker*, 102 Md. 250, 62 A. 526 (1905) (assault and false imprisonment). It claims that here the jury instructions did not give the definition of actual or express malice but instead described implied malice. Without discussing the issue of whether punitive damages can be based on implied malice we, nevertheless, disagree with the appellant's conclusion that the jury instruction did not explicitly delineate the necessary elements of actual malice. Actual or express malice may be characterized as the performance of an unlawful act, intentionally or wantonly, without legal justification or excuse but with an evil or rancorous motive influenced by hate; the purpose being to deliberately and wilfully injure the plaintiff. *Associates Discount v. Hillary*, 262 Md. 570, 278 A. 2d 592 (1971); *Vancherie v. Siperly*, 243 Md. 366, 221 A. 2d 356 (1966); *Galusca v. Dodd, supra; Dennis v. Baltimore Transit Co., supra; Heinze v. Murphy, supra;* Prosser, *Law of Torts*, 9-14, § 2, Ch. 1 (3d ed. 1964). The record shows that Judge Moorman advised the jury of what it must find as a condition to awarding punitive damages. He said: "Malice, in the legal sense, is any wrongful act done intentionally or wantonly and without legal justification or excuse. It requires an evil motive and an evil intention." He also told them that malice "signifies the defendant was influenced by hatred and spite and that he indulged in deliberate and wilful mischief to injure the plaintiff." It is true that the trial judge never specifically used the phrase "actual malice," however, we do not think it was required for his instructions clearly necessitated the existence of actual malice before the allowance of any award of punitive damages

could have been made. *Wynne v. Parsons*, 57 Conn. 73, 17 A. 362, 366 (1888). We find the instructions adequate on this issue.

## III

The appellant next claims error by the trial court in its failure to grant a motion for a mistrial. This motion was made when appellee's counsel in his final summation to the jury, allegedly argued contrary to the court's instructions. The declaration in this case contained three counts, each ending with a demand for $25,000 actual and $50,000 punitive damages. Judge Moorman instructed the jury that these claims could not be "pyramided". Nevertheless, appellee in his closing argument asked for the total amount claimed with each particular count; in effect asking the jury for $75,000 actual and $150,000 punitive damages. Appellant contends that not only was this in contravention of the court's instruction but in addition so highly prejudicial that no later instruction could possibly eliminate the damage. We do not agree. The judge, after denying the motion for a mistrial, but prior to jury deliberation, informed them that he was calling their

"attention to the fact that counsel in his closing argument mentioned the ad damnum clause and argued to you a stipulated sum of money to which he felt—thought he was entitled.

I instruct you as follows: That his statement is not evidence, you are to disregard it. The amount claimed by the plaintiff is not evidence and should be disregarded when you assess the amount of damages.

. . . You cannot in any event give a judgment in the amount of the sum claimed, regardless of whether you find for the plaintiff on all counts. You cannot award a sum of damages for compensatory damages in excess of $25,000.00 or punitive damages in excess of $50,000.00. I repeat, you are to disregard the

"prayers of the argument of the plaintiff in re-
lation to the sum that he claimed.

Now, the reason that the Court so instructs
you is that a person cannot be twice awarded
for his loss. Damages cannot be duplicated. The
damages in this case, although based on differ-
ent grounds arose out of an episode that was
one continuous occurrence on the date that it
happened; that is, the assault and battery, the
arrest, the malicious prosecution instituted."

Without considering whether this portion of the in-
structions limiting the ad damnum clause was proper,
we cannot see any prejudice to the appellant. The jury
was explicitly directed to disregard the tainted state-
ments made in closing argument and also told that un-
der no circumstances could it allow a recovery in excess
of $25,000 compensatory and $50,000 punitive damages,
in the event it found for the plaintiff. The issue of
whether counsel can mention to the jury the amount
claimed in the ad damnum clause rests within the sound
discretion of the trial court. Similarly, the method of
correcting over-reaching statements by counsel in final
argument is also in the discretion of the trial judge.
*Bauman v. Woodfield,* 244 Md. 207, 223-24, 223 A. 2d
364 (1966) ; *Nicholson v. Blanchette,* 239 Md. 168, 177,
210 A. 2d 732, 213 A. 2d 71, 14 A.L.R.3d 525 (1965) ;
*Jimmy's Cab Inc. v. Isennock,* 225 Md. 1, 10, 169 A. 2d
425 (1961). We see no abuse of this discretion here; in
fact the jury's verdict was well within the limits out-
lined by Judge Moorman.

## IV

Drug Fair complains that the trial court committed
reversible error by not allowing the testimony of Cpl.
Dennis, Hess' immediate superior in the police depart-
ment, to explain the police training Hess received, the
disciplinary action, if any, taken against him, as well as
his general character and reputation in the community.
At trial, appellant proffered to show that Dennis would

testify "to the training the officer has; the type of officer he was; what kind of training he had." Specifically Drug Fair's attorney said that the corporal "is not a character witness." From this proffer, without engaging in a discussion of whether such evidence is admissible in civil cases, we can quickly dispose of the claim that Dennis should have been permitted to testify concerning the general character and reputation of Hess. Since appellant clearly denied at trial the utilization of Dennis as a character witness, it cannot now reverse its position and claim error because such testimony was not allowed. This strategy is clearly unacceptable. As to the other proffered evidence of Dennis, Hess, himself, at trial set out in great detail his police training, including the specific courses he had taken and the credit hours received for them. He also related that there had been no disciplinary action against him and made mention of expressions of commendation he had received from his superiors in the department as well as civilians. Presupposing the relevancy of this testimony further elaboration would be unnecessary and cumulative, since it merely repeats previously undisputed evidence. We find no error on this issue.

## V

The last contention appellant makes is that the trial judge committed reversible error when he denied a request for a directed verdict and a judgment n.o.v. The record discloses that at the conclusion of all the evidence Drug Fair made a motion for "a directed verdict as to all three counts filed in the declaration against Drug Fair and all three counts both on the issue of compensatory damages as well as on the issue of punitive damages." However, no basis for the motion was included and it is clear that there has been no compliance with the requirements of Maryland Rule 552. This rule clearly provides that before a proper motion can be made "[s]uch motion shall state the grounds therefor." The record indicates that there were arguments both in support of and in opposition to this motion but even if such oral

arguments could be considered as complying with the provisions of the rule, they are not contained in the transcript of the proceedings and, of course, not printed in the record extract. We have no way of knowing what factors, if any, were considered and passed upon by the trial judge. Since under Rule 885 we do "not ordinarily decide any point or question which does not plainly appear by the record to have been tried and decided by the lower court," we cannot determine an unknown issue. Likewise, under Rule 563 a 1 the motion for judgment n.o.v. cannot be considered, much less acted upon, because the record does not disclose the denial of a valid motion for directed verdict "made at the close of all the evidence." *Glover v. Saunders*, 252 Md. 102, 249 A. 2d 156 (1969) ; *Beck v. Baltimore Transit Co.*, 190 Md. 506, 58 A. 2d 909 (1948) ; *Hajewski v. Baltimore County*, 184 Md. 161, 40 A. 2d 316 (1944).

In its brief before this Court appellant seems to suggest that these motions should have been granted because it produced five supportive witnesses while the appellee depended on only one. This argument is specious. It seems so elementary that we need not even cite authority for observing that sheer bulk or quantity alone does not tip the proverbial scales of justice. The number of witnesses that can be paraded back and forth at trial has no controlling effect on whether a motion for a directed verdict or a judgment n.o.v. should be granted.

*Judgment affirmed. Costs to be paid by appellant.*