551 A.2d 492

**Rebecca J. HANNA**

v.

**EMERGENCY MEDICINE ASSOCIATES, P.A., et al.**

**No. 473, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

Jan. 6, 1989.

596

Eileen M. Stein, Shady Side, for appellant.

Douglas B. Huron, Katherine L. Garrett, Kator, Scott & Heller, Laura F. Einstein and Dolkart & Zavos, Washington, D.C. for amicus curiae, Women's Legal Defense Fund.

Durke G. Thompson (Theresa M. Hall and Goldberg, Thompson, Pasternak & Fidis, P.A., on the brief), Bethesda, for appellees.

Argued before KARWACKI, WENNER and POLLITT, JJ.

POLLITT, Judge.

Appellant, Dr. Rebecca J. Hanna, sued appellees, Emergency Medicine Associates, P.A. (EMA), and its president, Dr. George W. Schweitzer, in the Circuit Court for Montgomery County. Her complaint alleged that appellees, her former employers, were liable for breach of contract (count I), a denial of her civil rights in violation of Chapter 27 of the Montgomery County Code (count II), intentional infliction of emotional distress (count III), abusive discharge (count IV), and "tortious interference with business and professional relationships" (count V). The basic premise alleged in support of all counts was that appellees had fired appellant in retaliation for her filing of a sexual discrimination suit against another medical group. She sought both compensatory and punitive damages.

During the jury trial, the court granted motions for judgment in favor of appellee, Dr. Schweitzer, as to all counts, and in favor of appellee, EMA, as to counts III, IV and V. Those rulings are not challenged on appeal.

The jury returned a verdict in favor of Dr. Hanna against EMA on count I in the amount of $3,300, and judgment was duly entered thereon. That judgment has not been appealed.

On count II, the jury found for Dr. Hanna and awarded damages of $21,198 as compensation for attorneys' fees. EMA's motion for judgment notwithstanding the verdict was granted by the trial court and judgment entered for EMA on that count. This appeal followed.

On appeal, Dr. Hanna presents the following issues for our consideration:

> I. Whether the court erred in setting aside the jury verdict on Count II on the ground that Dr. Hanna was bound by the testimony of an adverse witness called during her case in chief, when that testimony did not contravene any essential elements of plaintiff's case.

II. Whether the evidence was sufficient to support the jury's verdict for the plaintiff on Count II.

III. Whether the court erred in refusing to instruct the jury that, if they found for Dr. Hanna on Count II, she was entitled to compensation for any mental anguish, humiliation and embarrassment she sustained as a result of the retaliatory discharge.

IV. Whether the court erred in dismissing Dr. Hanna's claim for punitive damages.

We think the court erred in granting the judgment notwithstanding the verdict. We think also that there was sufficient evidence of mental anguish and actual malice to generate jury questions on the issues of "emotional" and punitive damages. Therefore, we shall reverse.

### Facts

Dr. Hanna received her medical doctorate from Pennsylvania State University in 1980 and began a three-year residency in internal medicine at George Washington University Medical Center in Washington, D.C. After completing her first year of residency, her internship year, she began to seek "moonlighting" work as an emergency room physician in the Washington, D.C., area. Beginning in August of 1981, she made several unsuccessful efforts to obtain employment with Alexandria Physicians Group, Ltd. (APG), a group providing emergency medical care for three local hospitals.

In April or May of 1983 she filed suit against APG alleging sexual discrimination, based on what she perceived to be a lack of response to her applications for employment, the hiring by that group of several male physicians while her applications were pending, and a letter to her from Dr. James D. Mills, president of APG, in which he acknowledged that his group had no women physicians employed, and cautioned her that he doubted her career would "be advanced over the long haul by feminism."

Meanwhile, in April of 1982, Dr. Hanna applied for employment with and was hired by Emergency Medical Associ-

ates. During the next 12 to 13 months, she worked on a part-time basis as an emergency room physician for EMA, working two or three shifts per month.

In the spring of 1983, Dr. Hanna inquired about increasing to full-time status with EMA, and in May was offered a position as a full-time salaried member of the group, with the third year option of becoming a partner. She declined the offer to become a partner at that time because she had completed her residency and had applied for a cardiology fellowship, but she agreed to work on an hourly basis. Dr. Hanna was additionally told she would have the option of becoming a full-time salaried member the following January if she so chose. She was placed on EMA's full-time schedule as of 1 July 1983.

As a result of the suit pending against the Alexandria Physicians Group, Dr. Hanna was asked to answer interrogatories, one of which was a question pertaining to her current place of employment. Realizing that the stockholders in EMA may be contacted about the suit, Dr. Hanna attempted to talk to Dr. Schweitzer, the president of EMA, in hopes of personally explaining the situation regarding the other medical group. Unable to contact Dr. Schweitzer, she instead told Rosemary Page, office manager for EMA, about the suit. Appellee admitted that:

The stockholder members of EMA were notified in early July, 1983 by the Plaintiff that she had instituted legal proceedings against the Alexandria Physicians Group, Ltd. for sex discrimination. This communication was received by Rosemary Page and was communicated to the members of the Board of Directors at their meeting of July 14, 1983, a copy of the minutes of which have already been provided.

Those minutes contain the following item:

6. Dr. Hanna

Concerns raised as to how she is working out. It is requested she be counselled [sic] and document everything.

The testimony during the trial did not reveal any definite conversations by the group at the Board meeting regarding Dr. Hanna's job performance, however, there apparently was concern expressed over having "her counseled, document[ing] things in all discussions with her and keep[ing] accurate records from then on." There also was concern that there was "a physician on board that was litigioness [sic]" and that they "should just cover ... bases by documenting anything that should ever come up in regard to Dr. Hanna, since she was taking somebody to court, another ER group to court."

Two days later, on July 16, Dr. Hanna received from Dr. Dyer, a stockholder of EMA, five pages of notes containing critiques of the charts of patients she had seen during the previous week. Dr. Hanna testified that she had never before received any negative comments about her performance from Dr. Dyer or any of the doctors.

On August 5, approximately three weeks following the stockholders' meeting of July 14, Dr. Wilner told Dr. Hanna that "they had a shareholders' meeting the night before and decided that [she] was to be fired [that] morning" based on "eight or nine charts of patients that [she] had managed" during that week. This suit followed. Further facts will be added where necessary.

## I and II

Appellant asserts that the trial court erred in granting appellee's motion notwithstanding the verdict, specifically because the court's stated reason for granting the motion was incorrect, and generally because the evidence was sufficient to support the jury's verdict as to count II. We think she is right for both reasons.

In granting the motion for judgment notwithstanding the verdict, the trial judge said:

[T]he plaintiff in her own case called the doctors to the stand, didn't give any limit to them: Did you find out that there was sex discrimination, a suit? Yes, we did. You thereafter fired her? Yes, we did. You stop there, perhaps you have the inference. But in the case, they

testified that that was not the reason that they fired her. It was not because of the suit.

They all testified—at least Dr. Schweitzer testified that Dr. Mills may have been selected as an expert witness by Dr. Donohue in the trial that he had pending before here [sic] but that he had no reason to appease him. They were creditors [sic—competitors].

This came out in plaintiff's case. It was unrebutted and it, therefore—you are bound by it. You cannot, therefore, draw the inferences adverse to it when there is no direct evidence that they in fact were endeavoring to endear themselves to Dr. Mills' group or they were firing her solely because they found out she filed a sex discrimination suit, and they being a group of men saying we'll get even with her for filing a sex discrimination suit; we'll fire her. . . .

[T]he testimony that was produced during the plaintiff's case was that that was not the purpose, and that was not directly refuted nor rebutted, and she is bound by it.

We think the trial judge misconstrued both Dr. Schweitzer's testimony and its binding quality. Dr. Schweitzer was called as an adverse witness by appellant in an unsuccessful effort to show Dr. Schweitzer's indebtedness to Dr. Mills of APG because Dr. Mills had testified for Dr. Schweitzer in a malpractice suit, the theory being that Dr. Schweitzer was returning the favor by firing someone who had sued Dr. Mills. As we said, that effort did not succeed. Dr. Schweitzer denied any friendship with or obligation to Dr. Mills. He did *not*, however, while testifying as an adverse witness, testify that such was *not* the reason for appellant's being fired. No reason for her firing was mentioned by Dr. Schweitzer in his adverse witness capacity. His testimony that appellees were not prejudiced against her by the previous law suit came much later in the trial when Dr. Schweitzer was testifying in his own behalf, and that testimony most certainly was in no way binding upon appellant.

Even if the adverse witness' testimony was, in some respects, unfavorable to appellant, and despite the

general rule that when one calls an adverse party as his witness, he is bound by his adversary's testimony unless it is contradicted or discredited, *Larsen v. Romeo*, 254 Md. 220, 255 A.2d 387 (1969),[1] we are aware of no rule which says that testimony must be *directly* refuted or rebutted. The jury is not required to "blindly adopt all such statements simply because no other witness has denied them and the character of the witness is not impeached." *Proctor Electric Co. v. Zink*, 217 Md. 22, 32, 141 A.2d 721, 726 (1958). As the Court of Appeals there stated:

> In the application of this rule, it is sometimes difficult to determine when a witness has been contradicted in a legal sense. *The testimony of a witness may be contradicted or discredited by circumstances as well as by statements of other witnesses*, and a jury is not bound to accept a witness' testimony as true if it contains improbabilities, or if there are reasonable grounds for concluding that it is erroneous. *It is the jury's duty to take into consideration all the evidence, whether circumstantial or otherwise*, tending to disprove any statement of fact made by a witness in the course of his testimony, and thus determine the weight or credibility to be given to such statement. [citations omitted, emphasis added]

*Proctor Electric Co., supra*, 217 Md. at 33, 141 A.2d at 726.

In this instance, even though Dr. Schweitzer's testimony may not have been directly rebutted, the jury was free to

---

**1.** The One Hundred Fifth Report of the Standing Committee on Rules of Practice and Procedure proposed to the Court of Appeals, among others, a new Rule 1–501, a verbatim copy of Federal Rule of Evidence 607, eliminating the "voucher rule," which generally precluded a party from impeaching a witness called by that party. *See* 15:21 Md. R. 2457–2461 (October 7, 1988). The new Rule was adopted by the Court in the form submitted, on November 23, 1988, to "take effect and apply to all actions commenced on or after January 1, 1989, and insofar as practicable, to all actions then pending." *See* 15:26 Md.R. 2975 (December 16, 1988). The new Rule states:

Rule 1–501. WHO MAY IMPEACH

The credibility of a witness may be attacked by any party, including the party calling the witness.

draw whatever inferences were necessary. While the evidence may have been primarily circumstantial, as we shall see, *infra*, there was more than sufficient evidence from which the jury could choose to disbelieve Dr. Schweitzer's testimony.

■ Appellant secondly asserts that it was error to grant the motion for judgment notwithstanding the verdict because there was sufficient evidence to support the verdict of the jury. In considering this argument we must resolve all conflicts in the evidence and all inferences fairly deducible therefrom in the light most favorable to support the right of the appellant to recover. *Smith v. Miller,* 71 Md.App. 273, 525 A.2d 245 (1987). Keeping in mind this standard of review, we have no difficulty in determining that there was evidence or inferences from which the jury could find that Dr. Hanna's employment was terminated in violation of the applicable statute.

Chapter 27 of the Montgomery County Code, § 27–17, prohibits discrimination in employment because of, among other things, that person's sex. Section 27–19(2) of that Article provides, among other things:

It shall be a violation of this Article for any person to cause or coerce, or attempt to cause or coerce, directly or indirectly, retaliation against any person because such person has lawfully opposed any act or failure to act that is a violation of this Article or has, in good faith, filed a complaint, testified, participated or assisted in any way in any proceeding or investigation under this Article....

Section 27–20(a) provides, in pertinent part:

Any person who has been subjected to any act of discrimination prohibited under this subtitle shall be deemed to have been denied a civil right and shall be entitled to sue for damages, injunction or other civil relief, including reasonable attorney's fees....

As we understand appellees' argument, both in the trial court and before this Court, they do not seriously contend that if, in fact, Dr. Hanna was fired in retaliation for having

filed an earlier sex discrimination suit, such firing would not be a violation of her civil rights under the county code. Their position is that Dr. Hanna failed to sustain her burden of proof. They further assert in this Court, although the question does not appear to have been presented to the trial court until after the trial, that "the trial court was correct in setting aside the jury verdict on count II upon defendant's motion" because "the plaintiff was never entitled to a jury on the determination of count II of the complaint." They posit that because the appellant was never entitled to a jury in the first place, the granting of their motion for judgment notwithstanding the verdict "is simply an expression of the trial court's verdict, and the trial court should be sustained but for reasons other than cited by the trial court at the time of its ruling." They acknowledge that this argument was raised for the first time in their motion for judgment notwithstanding the verdict.[2]

Rule 2–532(a) provides that:

In a jury trial, a party may move for judgment notwithstanding the verdict only if that party made a motion for judgment at the close of all the evidence *and only on the grounds advanced in support of the earlier motion.* [emphasis added]

The record extract discloses that appellees "renewed" their motion for judgment as to count II at the close of all the evidence, but does not disclose what reasons, if any, were assigned. The court's response in reserving ruling thereon indicates that the only question raised was the sufficiency of the evidence. Nothing in the record indicates the raising of any question about the right to a jury trial. Under these circumstances, the issue is not properly before us, and, ordinarily, we would not discuss it. Because the case must be remanded for trial on the issues of "emotional" and punitive damages, and solely for the guidance of the trial court on remand, Rule 8–131(a), we refer that court to

---

**2.** We are unable to find the motion for judgment n.o.v. in the record extract. We shall assume the question was raised at that time.

*Curtis v. Loether,* 415 U.S. 189, 194, 94 S.Ct. 1005, 1008, 39 L.Ed.2d 260 (1974), where the Supreme Court said:

The Seventh Amendment [right to trial by jury] does apply to actions enforcing statutory rights, and requires a jury trial upon demand, if the statute creates legal rights and remedies, enforceable in an action for damages in the ordinary courts of law.

■ As we have observed previously, the Montgomery County Code § 27–20, gives appellant the right to "sue for *damages,* injunction or other *civil relief."* This case, quite properly, was filed in the circuit court as a civil action and was tried on legal issues. Suits for damages are legal claims historically accorded the right to a jury trial as guaranteed by Article 23 of the Maryland Declaration of Rights. *Higgins v. Barnes,* 310 Md. 532, 530 A.2d 724 (1987); *Impala Platinum v. Impala Sales,* 283. Md. 296, 389 A.2d 887 (1978). If and when this case is tried on remand, the parties are entitled to trial by jury.

As to the sufficiency of the evidence, we have already indicated that it was sufficient. Certainly there was evidence, highlighted in appellees' brief, from which the jury could have found that appellant was discharged because of legitimate concerns about the quality of her performance. By its verdict, the jury obviously rejected that evidence. It chose to believe instead, as was its right, the testimony of appellant and her witnesses from which reasonable inferences could be drawn that her discharge was in fact retaliatory and in violation of her civil rights. Without recounting all of that evidence and inferences, it is apparent that from the evidence that appellant worked successfully and without complaint for about fifteen months; that three months prior to her discharge she was offered full-time employment leading to partnership status; that upon learning of the law suit, her employers almost immediately began documenting her every move, finding incompetence where none was found before, but acknowledging that at least some of those complaints were "not of serious import"; that other physicians testifying on her behalf found

Dr. Hanna's treatment in those cases appropriate; that she was fired three weeks later; and that since shortly thereafter she has been a successful emergency room physician and cardiologist, the jury could reasonably infer she was discharged because she had brought a discrimination suit against other doctors and not because of legitimate concerns as to her ability. Alleged discrimination resulting in violations of one's civil rights is just as susceptible to proof by circumstantial evidence as is any other factual issue. *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). The evidence was sufficient to support the verdict of the jury.

### III

Among appellant's requests for instructions to the jʳ was:

If you find for the plaintiff on Count II, in determining what damages she should be awarded you shall consider any monetary losses, expenses, mental pain and suffering, fright, nervousness, indignity, humiliation, embarrassment and insult to which the plaintiff was subjected and which are a direct result of the defendant's conduct. One element of the damages she is entitled to recover is her reasonable attorney's fees.

The court's instructions to the jury as to count II were:

With respect to the violation of the Montgomery County Code, it provides that any person who has been subjected to any act of discrimination prohibited under the division that I referred to, that is the firing—in this case the firing because of having filed a sex discrimination suit, shall be entitled to sue for damages, injunction, or other civil relief, including reasonable attorney's fees.

Therefore, you have an additional decision, if you should find for the Plaintiff on that count, then you should determine the damages that she has proven by a preponderance of the evidence, and also the entitlement to reasonable attorney's fees. That is an additional ele-

ment of damages if you should find for the Plaintiff that you would determine and assess.

In noting exceptions to the instructions, counsel for appellant said:

Yes, Your Honor, we would ask for the instruction of emotional pain, that she is entitled to pain and suffering, emotional distress compensation.

After further argument, the court ruled:

The fact that she is upset and cries, unless there is some outward manifestation of a physical injury or an emotional injury to the extent that there is a physical manifestation, then I hope that Maryland will continue to limit it to the out of pocket expenses instead of—because—why everybody that comes in and says they are upset—I will decline to give any instructions on emotional damages.

■ In rejecting the requested instruction, the court applied the "physical injury" test set forth in *Bowman v. Williams*, 164 Md. 397, 165 A. 182 (1933), and since followed by a long line of cases, that in order for a plaintiff to recover *in a negligence case* for mental or emotional distress, if there has been no physical impact, the evidence must disclose some "clearly apparent and substantial physical injury, as manifested by an external condition or by symptoms clearly indicative of a resultant pathological, physiological, or mental state." *Bowman, supra,* 164 Md. at 404, 165 A. at 184. *See Vance v. Vance,* 286 Md. 490, 408 A.2d 728 (1979), and cases there cited. That rule has no application to cases alleging intentional torts to the person (as opposed to intentional torts against property), "in which mental anguish is often the most substantial element of compensatory damage." *Testerman v. H & R Block, Inc.,* 22 Md.App. 320, 352, 324 A.2d 145, 162 (1974), *rev'd on other grounds sub. nom. H & R Block, Inc. v. Testerman,* 275 Md. 36, 338 A.2d 48 (1975) (the Court of Appeals there holding that the tort alleged was, in fact, one of negligence).

Thus, ordinarily, where the only damages sought result from the infliction of emotional distress and there is no proof of "physical injury," damages can be recovered only if an intentional tort is shown.

*Hearst Corporation v. Hughes,* 297 Md. 112, 145, 466 A.2d 486, 502–03 (1983) (Davidson, J., dissenting). *See also Curtis v. Loether, supra,* 415 U.S. at 195 n. 10, 94 S.Ct. at 1009 n. 10, where the Supreme Court likened actions alleging racial discrimination to actions for defamation or intentional infliction of mental distress. We think the same can be said of this case. We hold that count II alleged an intentional tort as opposed to negligence and the "physical injury" rule does not apply.

■ Here the testimony revealed that Dr. Hanna was "extremely upset, very tearful" when she was told that she was fired, according to Dr. Wilner. Dr. Wilner characterized Dr. Hanna as being "[d]istressed and stressed" and admitted that she had cried and expressed anxiety and fears about her career as the result of being fired. Kathleen Madison, a friend of Dr. Hanna's, stated that for a month after being fired Dr. Hanna was "very upset." She stated that Dr. Hanna "didn't look well . . . as if she had not been sleeping" and that "[s]he had lost quite a bit of weight." Dr. Hanna testified that she was "severely depressed," "humiliated" and "absolutely devastated." She experienced anxiety over finding employment elsewhere, and was worried about career prospects and the financial repercussions.

Appellees posit, and we agree, that this evidence does not mount up to the kind of "severe emotional distress" necessary to sustain an action for intentional infliction of emotional distress. *See Harris v. Jones,* 281 Md. 560, 380 A.2d 611 (1977). This is beside the point. The trial court granted judgment for appellees on that charge (count III) and that matter is no longer a part of the case. There is no requirement that the mental anguish sustained as a consequence of other intentional torts must be "severe." The plaintiff need establish only that such mental anguish occurred and that it was proximately caused by the conduct of

the defendant. Its "severity," or lack thereof, are matters to be considered by the trier of facts in determining whether and how much damages should be awarded. We think the evidence was such that appellant was entitled to have the jury pass on those questions.

## IV

■ In her complaint, appellant sought punitive as well as compensatory damages. At the conclusion of the plaintiff's case, the trial court granted defendants' motion for judgment as to punitive damages on the basis that appellant had produced no evidence of actual malice. We agree with appellant that this issue too should have been submitted to the jury.

Initially, appellees suggest that because § 27–20 of the Montgomery County Code, granting appellant the right to "sue for damages," does not specifically mention punitive damages, it necessarily follows that her rights under that statute are limited to compensatory damages.

As is the case in appellees' argument on the right to a jury trial, this was not the theory upon which this question was presented to or decided by the trial court. It is not before us. Rule 8–131(a).[3]

---

**3.** Appellees cite no authority for their proposition that Chapter 27 of the Montgomery County Code does not permit suits for punitive damages. They simply argue that "nowhere [in the statute] is there any language permitting an expansion of 'damages' beyond compensatory." If the question were before us, our response would be that nowhere in the statute is there any language limiting "damages" to compensatory. Although the basis for the suit here is the county statute, we think the claim is analogous to one for wrongful discharge, i.e. a termination without cause in violation of some clear mandate of public policy. See Adler v. American Standard Corp., 291 Md. 31, 432 A.2d 464 (1981). Such actions are available to contractual as well as at will employees, Ewing v. Koppers Co., 312 Md. 45, 537 A.2d 1173 (1988). The public policy component of the tort is regarded as particularly significant in that such actions foster the State's interest in deterring reprehensible conduct. Ewing v. Koppers Co., supra. We can think of no better deterrence than the allowance of punitive damages, where actual malice is proven. See Moniodis v. Cook, 64

■ Unquestionably, appellant's suit under count II is a tort action arising out of a contractual relationship, and, in order to recover punitive damages in such actions, actual malice is required. *Henderson v. Maryland Nat'l Bank,* 278 Md. 514, 366 A.2d 1 (1976); *H & R Block, Inc. v. Testerman, supra,* 275 Md. at 44, 338 A.2d at 52. Actual malice, in this context,

> "may be characterized as the performance of an unlawful act, intentionally or wantonly, without legal justification or excuse but with an evil or rancorous motive influenced by hate; the purpose being to deliberately and wilfully injure the plaintiff."

*Henderson, supra,* 278 Md. at 519, 366 A.2d at 4 (*quoting Drug Fair v. Smith,* 263 Md. 341, 352, 283 A.2d 392, 398 (1971)).

By virtue of Chapter 27 of the Montgomery County Code, and the verdict of the jury, appellees' intentional act of discharging appellant was unlawful, without legal justification or excuse. The remaining question is whether, when taken in the light most favorable to appellant, the evidence was such that the jury reasonably could have found such action was "with an evil or rancorous motive influenced by hate; the purpose being to deliberately and wilfully injure the plaintiff." We begin by observing that " '[m]alice, fraud, deceit and wrongful motive are oftenest inferred from acts and circumstantial evidence. They are seldom admitted and need not be proved by direct evidence.' " *Henderson, supra,* 278 Md. at 520, 366 A.2d at 4 (*quoting McClung–Logan v. Thomas,* 226 Md. 136, 148, 172 A.2d 494, 500 (1961)). In this regard, appellees argue:

> If the Appellee believed it was acting in good faith in believing it had a right, indeed an obligation, to discharge the Appellant, then there can be no actual malice. The testimony of independent physicians, nurses and staff of Dr. Hanna's incompetence is present throughout the

record. In contrast, the Appellant can present only inference from admitted circumstantial evidence in support of her claim.

Again, this argument misses the point. We previously have agreed with appellees that there was evidence from which the jury could have found for the defendants. It didn't. It could and did find by its verdict precisely the contrary.[4] Likewise, the jury could have found no actual malice had it been given the opportunity. On the other hand, evidence from which, if believed, the jury could have inferred "an evil motive with the purpose being to deliberately and wilfully injure the plaintiff" includes testimony that appellees wrongfully accused appellant of incompetence; that she was given no opportunity to respond to those accusations before she was discharged, and no opportunity even to discuss them; that she was not permitted to resign in lieu of discharge; that she was not given the 30–day notice called for in her employment contract; that ambiguous and contradictory letters of reference were given to her and to a prospective employer; and that four members or employees of EMA testified on behalf of APG in her suit against that organization. We believe these factors, coupled with the finding of the jury that appellant was unlawfully discharged, without legal justification or excuse, made the question of punitive damages properly a question for the jury, and we so hold.

JUDGMENT NOTWITHSTANDING THE VERDICT REVERSED; CASE REMANDED FOR NEW TRIAL ON DAMAGES; COSTS, EXCEPT THOSE OF AMICUS CURIAE, TO BE PAID BY APPELLEES.

---

4. The jury was instructed, in part: "She must establish that their reason for firing her was because she had filed the sex discrimination suit, and therefore they were retaliating or endeavoring to cause her to—punish her or suppress in some manner that suit, and that she must prove by a preponderance of the evidence that that was their sole purpose in firing her."