## THE BALTIMORE CONSOLIDATED RAILWAY COMPANY *vs.* WARFIELD PIERCE.

*Negligence—Liability of Master For Wilful Injury by Servant— Evidence on Both Sides to be Considered Together—Instructions to the Jury.*

In an action against a master to recover damages for an injury caused by his servant, when plaintiff's evidence is to the effect that the injury was wantonly and wilfully inflicted, and the defendant's evidence is that the servant did not act wilfully and was not negligent, the case is not to be withdrawn from the jury merely because the evidence of either party taken alone exonerates the defendant, if, when

all the evidence is considered together it authorizes an inference of negligence on the part of the servant in the discharge of his duty.

A master is liable for wilful injury done by his servant when acting in the course of his employment.

The question whether the act of the servant complained of was done within the scope of his employment, is generally one of fact to be determined by the jury. But in some cases the Court may determine as a matter of law, whether the servant was executing the master's business or not.

When an instruction to the effect that there is no evidence legally sufficient to entitle the plaintiff to recover, is offered at the conclusion of all the testimony, both the plaintiff's and defendant's, the Court must consider the whole evidence, and not that of the plaintiff alone, for that offered by the defendant may supply a defect in the proof of the plaintiff.

In an action against a master for an injury caused by his servant, the case is not to be withdrawn from the jury merely because plaintiff testifies that he thought the servant's act was wilful and malicious. The case is to be determined upon the facts, and not according to the opinions of witnesses.

The correctness of a prayer which makes no reference to the pleadings must be determined exclusively by a consideration of the evidence.

In an action against a railway company, plaintiff's evidence was to the effect that while driving in a buggy after dark, on a country road, his horse became frightened and ran down the track of the defendant's electric railway in front of a car; that he finally stopped his horse, and the car stopped behind him; that the motorman then exclaimed, that he would give plaintiff "a shot anyhow;" started up the car and ran into plaintiff's buggy, rendering plaintiff unconscious from the shock; that the horse began again to run down the track closely pursued at a high rate of speed by the car. Plaintiff also testified that he believed the motorman purposely ran into him. Defendant's evidence was that as soon as the motorman saw plaintiff on the track he used every effort to stop the car, and that the buggy was struck by a light blow. *Held*, that a prayer denying the right of the plaintiff to recover because, according to his evidence the motorman's act was malicious, and not within the scope of his employment, was properly rejected, because the evidence of both parties must be considered, and taken together it was legally sufficient for the jury to find from it that the motorman was not acting wilfully, but was negligent in not properly stopping the car before the collision, and also because there was evidence of negligence after the collision, when the car pursued the runaway horse.

Appeal from the Circuit Court for Baltimore County

(Burke, J.).   The defendant's third and fourth prayers were as follows :

*Defendant's 3rd Prayer.*—If the jury believe that the plaintiff drove upon that portion of Park Heights avenue, exclusively used by the defendant's cars and occupied by its " T " rail tracks and stone ballast, on a dark and rainy night, and drove his horse down said track for over two hundred yards, and that the motorman in charge of the defendant's car, after he discovered by the exercise of all due and proper care that the plaintiff was on the track, used every due and proper effort to stop his car before he should strike the plaintiff's carriage, but was unable to do so, and that said car collided with the plaintiff's carriage and frightened the plaintiff's horse, which ran away and caused the accident, then there is no negligence on the part of the defendant, and the verdict of the jury must be for the defendant.   (*Granted*).

*Defendant's 4th Prayer.*—If the jury believe that the motorman in charge of the defendant's car, after he had seen the plaintiff's carriage and had completely stopped his car, wantonly and maliciously and to gratify some private purpose, and not because it was necessary that he should again start said car, in pursuance of his employment, again started said car and ran into the plaintiff's carriage, and frightened the plaintiff's horse and caused the accident, that then the defendant is not responsible for such acts on the part of the motorman, and the verdict of the jury must be for the defendant.   (*Granted*).

The jury rendered a verdict for the plaintiff for $1,000.

The cause was argued before McSherry, C. J., Briscoe, Page, Boyd and Schmucker, JJ.

*George D. Penniman* and *Milton W. Offutt*, for the appellant.

*R. R. Boarman* and *Z. Howard Isaac* (with whom was *W. Gill Smith* on the brief ), for the appellee.

BOYD, J., delivered the opinion of the Court.

The appellee sued the appellant for injuries sustained by the former through the alleged negligence of a motorman employed by the company on its electric railway on Park Heights avenue, in Baltimore County, and, having recovered a judgment, this appeal was taken from the ruling of the Court in granting two prayers of the plaintiff and rejecting four of the defendant. The only questions urged before us, however, are presented by the defendant's first and second prayers. The first asked the Court to instruct the jury that the plaintiff had offered no evidence legally sufficient to entitle him to recover, and the second, that " the plaintiff having testified on the stand that the motorman of the defendant willfully and maliciously endeavored to injure him, the plaintiff is not entitled to recover in this action." It is contended that the plaintiff's testimony, if true, shows that the act of the motorman was willful and malicious, and was not within the scope of his employment so as to make the defendant responsible in damages for the injury sustained. At the argument the appellee claimed there was evidence of negligence, (1) when the collision occurred between the car of the defendant and the buggy in which the plaintiff was riding, and (2) after the collision, when the car followed the horse, which was drawing the vehicle in which the plaintiff was, as it ran down the road. We will consider the case in that order.

1. The plaintiff's own testimony was the only evidence offered by him, which reflects on the first branch of the case, but the prayers were offered after the testimony on both sides was in and we must, therefore, in passing on the legal sufficiency of the evidence, consider the whole record, so far as applicable, and we will refer to the testimony at some length. The accident happened in January, sometime after dark. The plaintiff had been in the city of Baltimore and reached Gray's Hotel about seven o'clock, where he remained a half hour or more, and then continued out Park Heights avenue. In his testimony he thus described the

accident:  " When he got to Seven-Mile Lane there was an electric light lit at the crossing, one on each trolley pole ; when he went to cross the bed of defendant's road at Seven-Mile Lane his horse frightened and ran down the railroad about 120 feet towards Baltimore ; when he went to cross, the car of the defendant was approaching from the north, about 150 feet north of the Seven-Mile Lane ; he had plenty of time to cross before the car could reach the crossing at the Seven-Mile Lane ; the car came down the track behind him ; when his horse was running down the track he holloed not to run into him ; a man in the car holloed ' look out, look out, look out, you will hit that man '; about that time witness had his horse stopped and under control ; the car stopped about 15 or 20 feet behind him ; while he was in the act of raising up to get out of the wagon for the purpose of leading the horse off the track, the car started up again, and the motorman said I will give the s— of a b— a shot anyhow ; the car struck the wagon and witness did not recollect anything more until the next morning, when he found himself at Gray's."    On cross-examination he was asked: " Do you undertake to say to this jury the man who controlled the car deliberately ran into you, that he attempted to murder you ? "    To which he replied, " Yes, sir ; I do honestly think he certainly did."    Then he was asked: " He tried to run you down and murder you ? " to which he replied, " He certainly did or he would not have used that expression if he had not."

The plaintiff also testified that he took one milk-punch at Gray's, but had not taken any other drink that day. Mr. Gray said on cross-examination that the plaintiff had taken two milk-punches, but left his place sober, and on re-examination he said he was not sure whether he took one or two.    The evidence of the other witnesses for the plaintiff, including the physician who attended him after the accident, was to the effect that he was not drunk.    Mr. Ingram, who lived on Park Heights avenue, about seven hundred

yards above Seven-Mile Lane, said a man, who was drunk, and whom he identified as the plaintiff, came to his place about eight o'clock of the evening of the accident inquiring for Spring Grove Asylum ; that he led his horse down the driveway towards the avenue, and he sent for an officer, but the man had gone when the officer arrived ; that they looked up the avenue about four hundred yards above the Seven-Mile Lane, saw the car stop, he and the officer procured a lantern and went up the railroad towards where the car stopped ; they saw the track of a buggy wheel or a wagon on the railroad and it turned off, they supposed, just below where the car stopped, and a little further down they picked up a hat, which the plaintiff admitted on the stand to be his. The officer and another witness corroborated Mr. Ingram in most particulars. The motorman, after saying that his car left Pikesville at 8.30 o'clock, gave this account of the accident : " That his car struck a one-horse buggy driven by a man on the railroad track of the defendant, about four hundred yards north of Seven-Mile Lane ; that he was about 300 yards from the entrance to Ingram's place ; that he saw the buggy on the track when he was distant about 50 or 60 feet ; that he reversed, used sand and the brakes, but could not prevent striking the buggy ; that he struck it light and only broke two links in the chain of the fender ; that if he had had four feet more the car would not have struck the buggy ; that when struck, the horse jumped down on the driveway and went across the road and disappeared." He denied the use of the language attributed to him or any words to that effect, and claimed he had used all means to avoid the accident ; that the night was dark and the tracks wet and slippery. The evidence also showed that the railroad between Ingram's entrance and the Seven-Mile Lane was constructed of ballast and " T " rail, the same as a steam road, and was elevated above the bed of the driveway.

The theory of the appellant is that if the evidence of the plaintiff be taken as true he cannot recover, because the act

of the motorman was wilful and malicious, and if that be not accepted the only other evidence was that of the defendant's witnesses, who exonerate the defendant from all blame. There is some actual and a great deal of apparent conflict between the authorities as to the liability of the master for willful and wanton acts of his servants. In many of the cases cited by the text-books, and elsewhere, the acts of the servants were committed under such circumstances as clearly place them outside of the scope of their employment, and hence there can be no responsibility on the part of the master, as, *quoad* the particular act complained of, the relation of master and servant did not exist. Then, again, there are a great many cases in which the master has been held liable, owing to the fact that such relations existed between him and the injured party as to make him responsible, although, strictly speaking, the servant was not authorized by the master to do the particular act—such for example as when a passenger of a common carrier is injured by an assault or other wanton act of the servant. The case of *Central Railway Co.* v. *Peacock*, 69 Md. 257, is an example of the former, while *B. & O. R. R. Co.* v. *Barger*, 80 Md. 23, shows what rule this Court has applied with reference to the latter. But neither of those classes are wholly applicable to the case before us. Our predecessors in *Brown* v. *Purviance*, 2 H. & G. 316, stated the general rule to be that " the master is answerable for all injuries arising from the negligence or unskillfulness of his servant in executing duties assigned him ; but when he abandons his duty and wilfully becomes a wrongdoer, the master is exempt from all responsiblity for such wrongful acts." It was there said that the case of *McManus* v. *Crickett*, 1 East. 106, "fully and satisfactorily settled " the nature of the liability to which a master is subjected for the acts of his servant, and although *McManus* v. *Crickett* has been criticised, explained and modified by many authorities, it will be observed that the rule stated by our predecessors, as above quoted, in terms only relieved the master when the

servant abandoned his duty—meaning of course his duty to his master by virtue of his employment.   As was well said in *Evans* v. *Davidson,* 53 Md. 245, "in one sense where there is no express command by the master, all wrongful acts done by the servant may be said to be beyond the scope of the authority given ; but the liability of the master is not determined upon any such restricted interpretation of the authority and duty of the servant.   If the servant be acting at the time in the course of his master's service and for his master's benefit, within the scope of his employment, then his act, though wrongful or negligent, is to be treated as that of the master, although no express command or privity of the master be shown."   In that case some hands of the defendant, who were employed to do general farm work on his farm, on seeing cattle in his cornfield started to drive them out and one of the servants killed the plaintiff's cow by negligently striking her with a stone. The Court below took the case from the jury because there was no evidence legally sufficient to entitle the plaintiff to recover.   This Court reversed that decision on the ground that driving the cattle out of the field was within the scope of the servant's employment and the defendant was therefore liable.   The defendant had not employed or authorized the servant, expressly or impliedly, to kill the cow, and he did not even know the cattle were in the corn, but, as driving out the cattle came within the scope of his employment, the master was liable, although the particular method of executing the act embraced in the scope of the employment was not expressly authorized or even contemplated. It is true that in that case the servant was only charged with being negligent, but whether negligently or wilfully done in the course of the servant's employment, and in furtherance of the master's business, the latter is liable, but if the act of the servant is wilfully or wantonly done and not connected with or having relation to his employment, then of course the master cannot be held responsible.   The pivotal question, therefore, in such cases usually is, whether

the servant was acting at the time in the course of his master's service and for his benefit, within the scope of his employment, and the mere fact that he acted unlawfully, wilfully or wantonly, does not necessarily show that he is no longer in his master's employ.    The statement in *McManus* v. *Crickett*, that "the servant by wilfully driving the chariot against the plaintiff's chaise without his master's assent, gave a special property for the time, and so for that purpose the chariot was the servant's," carries the doctrine too far and is not in accord with most of the modern decisions. In *Cate* v. *Schaum*, 51 Md. 309, this Court said, "indeed the authorities are numerous to show that a master is liable for the illegal acts of his servant done by force or in wantonness, while in the performance of an act within the scope or course of his employment." The cases on this question are very numerous, and in the note to *Ritchie* v. *Waller*, 63 Conn. 155, as reported in 27 L. R. A. 161, there is a very elaborate discussion of the authorities, including most of the cases referred to by the appellant, but under our view of this case it would not serve any good purpose to further prolong the discussion of them on this point.

The question whether the act of the servant complained of was done in furtherance of the master's business, within the scope of the servant's employment, is generally one of fact to be determined by the jury.    In *Cleveland* v. *Newsom*, 45 Mich. 62, it was held that the burden was on the defendant to show that the servant was not engaged in the course of his employment.    In *Rounds* v. *Delaware, Lack. & West. R. R. Co.*, 64 N. Y. 129, the Court said it is ordinarily a question to be determined by the jury.    But, as was said in *Ritchie* v. *Waller*, *supra*, when the servant's deviation from the strict course of his employment or duty is slight and not unusual, the Court may determine, as a matter of law, that he is still executing the master's business, and if the deviation is very marked and unusual it may determine the contrary.    If, as in the *Peacock case*, *supra*, the driver deliberately abandons his car and makes an assault on one not a

passenger, on the sidewalk, the Court must determine the question, because the act is too clearly out of the course of the servant's employment to hold the master responsible. If this motorman had jumped off his car and gone to the plaintiff and then struck him on the head, the effect of such an act on the liability of the master would also be clear, as the fact that he had departed from his employment would be marked; and if there was uncontradicted evidence that after stopping the car he deliberately started up again, using language such as the plaintiff attributed to him, and ran into the vehicle occupied by the plaintiff, rendering him unconscious, without any evidence or circumstances to show that he was acting in furtherance of his master's business, within the scope of his employment, the master might be equally exempt. For it would be making an unreasonable distinction to say that he would not be responsible if the motorman used his brake-handle, for example, in making the assault, but would be if he with the same deliberation and intent used the whole car to accomplish his unlawful purpose. But as the motorman's business was running the car, if there were any circumstances from which it could be fairly inferred that he was simply endeavoring to clear the track so he could proceed with his car, or do something in furtherance of his master's business, it would be a question for the jury. So if the motorman had started his car under the circumstances described by the plaintiff, without the use of such language as is attributed to him, or something else to explain his motives, the Court would have been called upon to submit the case to the jury, for it might well have been attributed to reckless negligence. When these prayers were offered the motorman had been on the stand and had unqualifiedly denied that he had made this statement or anything to that effect. It is true that he also gave an entirely different account of the accident, and if the jury believed him in all respects, the company would have been entitled to a verdict. But when an instruction to the effect that there is no evidence legally sufficient to en-

title the plaintiff to recover is offered at the conclusion of all the testimony, both the plaintiff's and defendant's, the Court must consider the whole evidence and not that of the plaintiff alone, for that offered by the defendant may supply a defect in the proof of the plaintiff. *State, use Harvey* v. *B. & O. R. R. Co.*, 69 Md. 339. The jury may have believed the plaintiff's story, as to the circumstances of the accident, in all respects excepting the statement attributed to the motorman, and might have found that the motorman was simply negligently discharging his duties. Indeed, if we take into consideration the verdict in connection with the defendant's third and fourth prayers, it is evident they in point of fact did so. The third prayer, which was granted, submitted the case on the theory presented by the motorman's testimony, and by the fourth the jury were instructed that if they believed the motorman, after he had seen the plaintiff's carriage and had completely stopped his car, "wantonly and maliciously and to gratify some private purpose, and not because it was necessary that he should again start said car, in pursuance of his employment, again started said car and ran into plaintiff's carriage and frightened the plaintiff's horse, and caused the accident," the defendant was not responsible and their verdict must be for it. But the Court could not say, as it was asked to do by defendant's second prayer, that "the plaintiff having testified on the stand that the motorman of the defendant wilfully and maliciously endeavored to injure him, the plaintiff is not entitled to recover in this action." It is true that he said he believed the motorman tried to murder him, but that was simply his opinion. Although we have examined many cases reflecting on the question of the liability of the master, when the act of the servant is shown to be wilful and deliberate, including all of those cited by appellant, we have not found any in which the Court took the case from the jury because the plaintiff testified or thought that the servant's act was wilful and malicious. Juries must be governed by the facts as disclosed by the evidence, and

reach their own conclusions, under the instructions of the Court, and must not in cases like this render their verdicts on the mere opinions or conclusions of the witnesses, even if they be parties to the suit.    So far as the plaintiff's *evidence* was concerned, that was to be taken in connection with the other evidence in the case.    If it be conceded that if the evidence of the plaintiff be true, it alone did not make out a case against the defendant, and that the evidence of defendant, if believed by the jury, was sufficient to acquit it of default (if that offered by the plaintiff be excluded), the difficulty still exists that the Court, in passing on the prayers, was not authorized to consider the one and exclude the other, but was compelled to take all the testimony on both sides into consideration.    We are, therefore, of the opinion that the Court was right in rejecting these prayers.

2. There was also some evidence from which the jury might have reached the conclusion that there was negligence after the collision, and while the horse was running away.    A witness for the plaintiff testified that the horse was running rapidly "and the car was right after it;" when they reached Gray's, that the car ran on rapidly, passed about one hundred and twenty-five yards before it stopped. His attention was attracted by a noise up the road—some one cried out.    Others testified to the same effect, and there was some evidence tending to show that some one on the car was making the noise.    One witness said the horse was running at the rate of fifteen or eighteen miles an hour, and that the car was keeping pace with the horse.    The motorman admitted that he wanted to get close to the horse so as to stop him if he could, although he said that the man in the buggy was holloing, and fixed a lower rate of speed than the plaintiff's witnesses did.    When the horse was stopped, it was found that "the hind part of the wagon was jammed up into the front part," and the plaintiff was between the right front wheel and the shaft, his feet being caught under the seat, his stomach next to the shaft, and his "rump" against the wheel, his head was dragging, and

the hair worn off the top of his head, which had a deep cut in it. It is therefore quite possible that the injury sustained, at least some of it, was received after the collision, and while the horse was running away. There was certainly some evidence tending to show negligence during that time, as the effort of the motorman to overtake the horse may have caused it to continue to run. There may be some question as to whether the declaration was properly drawn to include negligence after the collision, but no reference is made to the pleadings in the prayers, and hence their correctness must be determined exclusively by a reference to the evidence. 2 *Poe*, section 302 and note, where many cases in this Court to that effect are cited. By the seventh prayer the defendant itself submitted this question to the jury. Being of the opinion that there was evidence of negligence after the collision to be submitted to the jury, we think these prayers were properly rejected for that reason, as well as those we have previously referred to, and no other question being urged before us, the judgment will be affirmed.

*Judgment affirmed, appellant to pay costs above and below.*

(Decided June 21st, 1899).