WALTER J. RUSNACK *v.* GIANT FOOD, INC.

[No. 896, September Term, 1974.]

*Decided May 9, 1975.*

The cause was argued before ORTH, C. J., and GILBERT and LOWE, JJ.

*Charles W. Bell,* with whom were *Michael J. Ragland* and *Bell & Ragland, P.A.* on the brief, for appellant.

*James P. Salmon,* with whom were *Sasscer, Clagett, Channing & Bucher* on the brief, for appellee.

ORTH, C. J., delivered the opinion of the Court.

The only issue on this appeal is the propriety of the grant at the close of all the evidence of a directed verdict in favor of Giant Food, Inc., appellee, the defendant in a tort action brought by Walter J. Rusnack, appellant, in the Circuit Court for Montgomery County.

## CASE SUMMARY

On 5 September 1972 Rusnack filed a declaration in the Circuit Court for Montgomery County against Giant, C. Dale Steinhauer and Leonard Davis. We are concerned with the action only as it affected Giant, the only defendant against whom trial proceeded.[1] Damages were sought from Giant in count two for assault and battery, in count four for false arrest and in count five for malicious prosecution. The case went to trial before a jury on 22 July 1974. Giant's motion

1. On 17 May 1973 Rusnack dismissed with prejudice the cause as to Steinhauer. Davis was never served, and on 21 November 1974 Rusnack dismissed without prejudice the cause as to him.

for a directed verdict was granted at the close of all the evidence and on 29 July 1974 judgment was entered in favor of Giant for costs. Maryland Rule 552. Rusnack noted a timely appeal from the judgment.

## THE FACTS

The rule of law prevails that where the court directs a verdict in favor of one of the parties, we must assume the truth of all credible evidence in the case tending to sustain the contentions of the party against whom the verdict is directed as well as all inferences of fact reasonably and fairly deducible therefrom. *Durante v. Braun,* 263 Md. 685, 689, and cases therein cited. Thus, in determining whether a plaintiff has produced sufficient evidence to go to the jury, the evidence produced, as well as all legally permissible inferences drawable therefrom, must be considered in the light most favorable to the plaintiff. *Wood v. Abell,* 268 Md. 214, 231. We narrate the evidence adduced accordingly.

Rusnack, 59 years of age, lived with his wife and son in Rockville, Maryland. He was a chemical engineer by profession and had been employed for about 10 years by the Department of Commerce as a branch chief. He had no criminal record, and, in fact, before the incident here considered, had never before been arrested or charged with a crime. He had shopped many times in the past at the Giant Store on North Washington Street in Rockville, designated by Giant as its Store No. 105. On 9 May 1972, shortly before 7:00 p.m., he was in that store to get some ice cream, crackers and milk. He put those items in a shopping cart and went to the express checkout counter to pay for them. We recount what happened in his words:

> "I was in this line waiting to get checked out. I did notice that there wasn't anyone at the counter next to me. I stepped out of line and went to this counter and found that there were a number of groceries on the counter and I stepped back in line again.
>
> The woman who was directly behind me took the

place where I had been and I moved into line directly behind her. We were in that particular position for maybe two minutes or so, and then this man, who is to be identified as Leonard Davis, approached the counter, the checkout counter. . . . I had never seen him before. . . .

Well, this lady in front of me moved up to take her groceries out of her cart, which she did, and she moved her cart out of the road; and just as she did that, I started my cart moving up to take the place where she had been to wait my position in the line. Just as I moved my cart up, Leonard Davis jumped in front of me. He was with his back towards me. At that particular moment my cart contacted the back of his legs. . . . [The degree of force was] just the ordinary force that you use to actually push a cart into position. . . .

Well, then as soon as that occurred, he turned around and said something unintelligible to me. And he charged me. He charged me so viciously that I went down backwards and slammed the back of my head on the floor. And he came down on top of me. I was dazed and I was endeavoring to get up on my feet when I discovered that he had handcuffs. . . .

It went through my mind as to what was the matter with this man, what was he trying to do to me. He started to try to put these handcuffs on me and I started to struggle with him, of course. . . .

Well, I kept struggling, and I got up, partly up on my feet, and I turned around to the crowd to ask them if someone would go and get the police, that I was being manhandled there. Well, in the meantime, another man actually appeared on the scene and while Leonard Davis went and twisted my arm around my back and up. It felt like my arm was being pulled out of the socket.

Another man took hold of me on the right side. In

the meantime, the handcuffs were put on my left arm and when I went down the second time, that's when the other handcuff was put on me. My other arm was pulled behind me and I was struggling, in the meantime to get free. I had no reason to submit to this kind of treatment. . . .

When I went down the second time I asked him, 'Are you a store guard?' And he said, 'Yes', and he pulled this thing out of his pocket; and he pulled something out part way and then he pushed it back in again. I said, 'Let me see that again.' In fact, I asked him this four or five times to let me see that again. He wouldn't show it to me anymore. I was so exhausted by that time with the struggling that had gone on; and, finally, they lifted me up because I couldn't get up myself. They lifted me up and I saw Mr. Gill, I didn't know his name at the time, but who he had been. I had seen him in the store previously. That I presumed that he was a store manager. I asked him, in particular, 'Is this man a store guard?' And he replied in one word, 'Yes' . . . . [Gill was] the manager or assistant manager. He seemed to be in charge that particular night. . . .

I was taken through the counters and I was standing there in front of the store. When the handcuffs were put on me before I got that far, Leonard Davis actually rammed this one handcuff down my left arm so tight that I was in such excruciating pain. . . .

First, he went and took my arm, pulled it clear up like this. He was trying — twisting my arm clear over my shoulder. . . .

Yes, on my left arm. As soon as he got my arm down behind me, that's when they put the cuff on. When I went down that second time, that's when the other arm was pulled behind me. I was struggling to get free in the meantime. That's when

he put the other handcuff on me behind my back. Before I got up, he give this handcuff a real squeeze on my arm which made it very, very tight and it dug into the skin. It felt like my arm was broken. . . .

After I was handcuffed, I was taken in the front of the store and I was standing there. They followed me. I had to wait there until the police came and I was reflecting on the fact that, here, I just had gone in for a few articles and all of a sudden I find myself bleeding and beaten and handcuffed and humiliated in the way I was in waiting to be picked up by the police. . . .

I had my face lacerated or cut like — on the side of my face here. I had my forehead very much bruised and my nose bridge was bloody. The fact is, my face was very bloody while I was standing there. . . .

Well, I had my right ankle twisted. I felt like I had a sprained ankle. Later, I noticed I had other black and blue marks on my legs. . . . I was taken outside after I was standing in front of the cash registers. Then, the County Police arrived and took me outside and, actually, placed me in their automobile. . . .

I lost my glasses. I lost my wrist watch. . . . In the scuffle my glasses came off and they were badly twisted. My wrist watch was torn from my left arm and both of them I lost. I didn't realize this until after when I was taken over to the police station. . . .

I went back to the Giant Store, after I was processed over at the police station, and I asked for my glasses; and I went to this man that was the manager, a Mr. Gill, I learned his name at that particular time from the name card that he had on his blouse, on his shirt, and he said he would help me find them. He told me my glasses were on the

time clock and we went to search for the wrist watch. The only thing we could find of the wrist watch was the band. The watch was gone. I never did see it afterwards. . . .

[Davis] showed up at the police station a little bit later; and while he was in the police station, I sat there for quite a long period of time. I guess they got the key from him and what not. That's when they removed the handcuffs from my arms; and it was at that particular time that I held my arm up and said to the men that brought me there that they could testify as to the severe damage that was done to my left arm by those handcuffs. The skin had almost broken through and felt like the arm was broken, actually . . . It was something of the order of an hour before I finally got out of there. . . .

First, I sat there for some time while they talked to Leonard Davis, or he was contacted — or he contacted somebody, I believe, and then someone asked him if he was going to prefer charges against me and he said, 'Yes'.

Then these handcuffs were taken off me and I was brought into the police commissioner. When I went into the police commissioner's office, Corporal Schwartzel brought me some wet paper towels and I started to take some of the blood off my face. He told me my face was very, very bloody and that I could clean it up. This is what I started to do. I then related the incident that had occurred to me to the police commissioner, and it was then that I was finally allowed to go back to the store and hunt for my glasses and for my wrist watch."

A summons was issued in the District Court of Maryland for Montgomery County charging Rusnack with the assault and battery of Davis. He was released on his own recognizance. He was tried on 29 June 1972 and found not guilty.

Davis was described by Rusnack and eyewitnesses to the

incident as a man in his early thirties, about 5 feet 10 inches tall, of medium build and "fairly muscular," and dressed in civilian clothes. Information about him came into evidence primarily through Leonard Abelman, employed by Giant as an Internal Security Employment Investigator [2] in the Department of Watch Prevention, formerly called the Security Department. Abelman was a store detective for Giant when Davis was first employed by Giant as a store detective.[3] They both worked at Store 69 until Abelman was promoted to the position of Investigator. While they were together Abelman worked with him on the floor for about two weeks "showing him the ways that we operate as store detectives and so forth." Abelman was not familiar with the training Davis may have had before and after that time. All security personnel were issued an identification card with a photograph of the employee, his name, height, weight, and thumb print and the title of his position. Security officers are not issued handcuffs. Abelman did not know whether Davis was authorized to use them or not. "That is really up to the District Security Superintendent who is there, the District Supervisor, or whatever policy he would decide on for his particular area." If authorized to carry handcuffs, the employee must himself furnish them. Security officers were not allowed to carry other accessories such as revolvers and blackjacks, "[m]eaning we don't supply and we don't allow our people to use that type of equipment." A security officer was authorized to swear out warrants in the course of his duties. "When he was on duty and in his assigned store, then he was allowed to make apprehensions of people and to swear out warrants against them." Abelman later explained: "[H]e technically could not make an arrest. He could detain the person for the police to come and make the arrest." In the past Davis had "apprehended people and detained them at the store for the police to come so they can arrest people."

---

**2.** As such Investigator, Abelman worked out of the main office as a "troubleshooter", going to any store in which a problem arose.

**3.** Abelman said that "store detective", "security detective", and "security officer", are synonymous as those terms are used within the Giant organization.

A security officer who saw someone shoplifting or disorderly or breaching the peace could on his own initiative — "he would be acting on his own" — detain the offender and have the police make the arrest.[4] Evidence adduced was equivocal with respect to the authority of a security officer to detain suspects and swear out warrants for their arrest while not in a store to which he had been assigned or while off duty. The matter came up during the examination of Abelman. The transcript reads:

"Q. Is there any requirement or any restriction or was there any requirement or any restriction on Mr. Davis on May 9, 1972 that he could not make an arrest in any Giant Food, Inc. store if he saw, in fact, if he was on duty and, in fact, saw a violation of law?

A. Well, if Mr. Davis had been on duty on that day and had been working in the store that he was assigned to, then he would have been able to act in his capacity as a store detective as he would in any store when he was on duty and is working.

Q. If Mr. Davis had been in a store to which he was not assigned on that day and had his identification and equipment with him and saw what he thought was a violation, would he have been authorized by his employer to make an arrest?

A. No, sir, because if he is not in the store to which he is assigned, then I would have to say he must be off duty; and we have never delegated any authority to our security people to make an arrest when they are off duty.

Q. But you never told them they couldn't if they observed a violation of law while in any Giant Store, have you?

4. It appeared that Davis did not hold a special police commission. See Code, Art. 41, §§ 60-70, subtitle "Special Policeman." According to Abelman, Davis had such a commission when he worked for the Hecht Company, "and when he left the Hecht Company that commission was cancelled."

A. Sir, it has never come up. And as I said, we never delegated the authority to our people to make an arrest and certainly not in a personal situation. . . .

Q. Have they been actually given any authority to what they can or cannot do? I am speaking now of the security personnel including Mr. Davis when in other stores to which assigned or to stores other than those to which they are directly assigned?

A. We have, as I have said, the subject has never come up, to my knowledge; and we just have never delegated the authority or told our people that they can make an arrest whenever they are in one of the stores and happen to see something. It has just never come up, and we have never delegated the authority to do something like that.

Q. On the same hand, you never told them they are not to do so, have you?

A. Not to my knowledge, no, sir.

Q. Have they been told they are to leave their handcuffs, badges, or identification at home when they are not in the store working, specifically, in the store to which they are assigned?

A. No, sir." [5]

It was clear that Davis was not on duty on 9 May 1972 in Giant Store No. 105 on North Washington Street. The payroll records showed that he had worked there for 38 hours about a month before the incident with Rusnack. For the week ending 13 May, which included 9 May, Davis worked only one day and that day he worked at Store No. 69

---

5. Franklin E. Gill, the night manager of the Giant store in Rockville, told of a previous occasion when Davis, not on duty, had brought to his attention an incident involving another employee. "[Davis] was shopping in the store one night at closing time. We had a grocery crew that came in around twelve, I believe. He came up to the office and told me that he had — he identified himself and showed me his identification from Giant Food and said that one of the grocery crew had taken a pint of cream off the shelf and put something in his coffee and set it over on the counter."

on the Rockville Pike.[6] It was the practice of the security personnel to identify themselves to the manager when they came on duty. Davis had not done so on 9 May 1972 and Franklin Gill, the manager on duty said flatly that Davis was not on duty at the time of the Rusnack incident. It was apparent that Davis was in the store shopping. Gill knew that Davis was a security officer because of the incident of the employee and the cream. Davis shopped in the store "twice a week." Gill had seen him there "numerous times during the week."

Although there were no witnesses who saw what precipitated the incident, there were several who saw Davis assault Rusnack and their version was not in substantial conflict with that given by Rusnack. Gill told one of them, Steinhauer, a customer, that Davis "was making an arrest. He was the store detective." It was then that Steinhauer grabbed Rusnack and held him while Davis put on the handcuffs. "I assumed he was doing his job and that, you know, he needed help in getting Rusnack." Margaret Sullivan, another customer, ran to Gill when she saw two men on the floor struggling, and asked if the police had been called. Someone told her Davis was "a security man." Someone also asked Davis for identification. She may have done so or it may have been Rusnack. Davis did not identify himself. At the police station Davis signed the application he made for a summons as "Security Officer Leonard Davis, 12051 Rockville Pike, Rockville Md." The address was that of Giant Store No. 69. In the application, received in evidence as part of Rusnack's exhibit No. 5, Davis set out his version of what happened:

> "I got in line behind a lady and stood in line for five minutes and the lady in front of me put her

---

6. For the week ending 8 April Davis worked at Store No. 54, a Super Giant on East-West Highway and Colesville Road, and at No. 69. The weeks ending 15 April, 22 April, 29 April, and 6 May, he worked only at No. 69. The week following the incident he worked 6½ hours at No. 69 and received 24 hours sick leave. He was "terminated" on 24 May 1972. Abelman explained: "Whenever anyone leaves our company, resigns or is fired or leaves for any reason, the terminology we use, we say he was terminated from the company." It seems that Davis resigned.

merchandise on the counter, and I move the cart and went to put the merchandise on the counter, I felt a hard blow on my leg, I dropped the merchandise in my hand and I got hit again, the third time I grabbed the cart and pushed the cart away from me and he hit at me and I grab his arm to keep from being hit, and we fell to the floor. The second time we fell, I put my handcuff on him, with the assist of another fellow."

## THE LAW

The doctrine of *respondeat superior* arises from the principle that the liability of the master for the tortious acts of the servant rests at last upon the existence of authority, that the act must have been done in the course of employment which the master has authorized, and that, unless such authority can be shown, there is no liability. In other words, "[w]here the relationship between the employer and employee is that of master and servant and an attempt is made to hold the master liable for the tortious acts of the servant, the master is liable only for those acts of the servant which have been committed while in the exercise of those acts expressly or impliedly authorized by the master." *East Coast Lines v. M. & C. C. of Balto.*, 190 Md. 256, 284. See *A. & P. Co. v. Noppenberger*, 171 Md. 378, 392.[7] "The fact that the servant is in the general employment of the master does not create an inference that a certain act done by him was in the scope of his employment. To be within the scope of the employment the conduct must be of the kind the servant is employed to perform and must occur during the period not unreasonably disconnected from the authorized period of employment in a locality not unreasonably distant from the authorized area, and

---

7. Noppenberger points out, at 389-390, that the doctrine of apparent authority is applicable only where the relation of employer and employee is that of principal and agent. "In the case of a servant, whose acts do not create, but violate, primary rights, and give rise to secondary obligations and remedial rights, appearances are of less importance because ordinarily the third party is not misled by the master's representations of the servant's authority. . . In such a case the course of employment is said to be the basis of liability." *Id.*, at 390.

actuated at least in part by a purpose to serve the master." *East Coast Lines*, at 285, paraphrasing *Noppenberger* at 390.[8] Restatement (Second) of Agency § 229 (1958) discusses the kind of conduct which is within the scope of employment:

"(1) To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized.

(2) In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered:

(a) whether or not the act is one commonly done by such servants;

(b) the time, place and purpose of the act;

(c) the previous relations between the master and the servant;

(d) the extent to which the business of the master is apportioned between different servants;

(e) whether or not the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant;

---

8. The source of these statements was given in Noppenberger as "A.L.Inst., Restatement, Agency", secs. 228, 229, 233, 234, 235, 236. Restatement (Second) of Agency § 228 (1958) reads:

"(1) Conduct of a servant is within the scope of employment if, but only if:

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits;

(c) it is actuated, at least in part, by a purpose to serve the master, and

(d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master."

(f) whether or not the master has reason to expect that such an act will be done;

(g) the similarity in quality of the act done to the act authorized;

(h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;

(i) the extent of departure from the normal method of accomplishing an authorized result; and

(j) whether or not the act is seriously criminal."

See *Noppenberger* at 390-391. An act may be within the scope of employment although forbidden or done in a forbidden manner, *id.*, § 230; although consciously criminal or tortious, *id.*, § 231; although done in part to serve the purposes of the servant or a third person, *id.*, § 236. On the other hand, the conduct of a servant is within the scope of employment only during a period which has a reasonable connection with the authorized period, *id.*, § 233, and only in the authorized area or in a locality not unreasonably distant from it, *id.*, § 234. An act of a servant is not within the scope of employment if it is done with no intention to perform it as a part of or incident to a service on account of which he is employed, *id.*, § 235. Comment b to § 235 states:

"The servant may be within the scope of employment, although his departure from instructions in the performance of his work is for his own purposes, if his act is done with the intent to serve his employer."

Comment c to the section reads:

"The fact that an act is done in an outrageous or abnormal manner has value in indicating that the servant is not actuated by an intent to perform the employer's business. . . . In such cases, the facts may indicate that the servant is merely using the opportunity afforded by the circumstances to do

the harm. Hence, unless the principal has violated a personal duty to the person injured, or unless he becomes liable because of the nature of the instrumentality entrusted to the servant . . ., he is not liable for such acts."

Also, a master is subject to liability for the intended tortious harm by a servant to the person or things of another by an act done in connection with the servant's employment, although the act was unauthorized, if the act was not unexpectable in view of the duties of the servant. *Id.*, § 245.[9] In *Hopkins C. Co. v. Read Drug & C. Co.*, 124 Md. 210, 214, the Court of Appeals gave a capsule statement of the test, as it was set out in *Wood on Master and Servant*, § 279, and quoted in *Sawyer v. Railroad*, 142 N. C. 7, 54 S. E. 793:

> "The simple test is whether they were acts within the scope of his employment; not whether they were done while prosecuting the master's business, but whether they were done by the servant in furtherance thereof, and were such as may fairly be said to have been authorized by him. By 'authorized' is not meant authority expressly conferred, but whether the act was such as was incident to the performance of the duties entrusted to him by the master, even though in opposition to his express and positive orders."

This was quoted with approval in *Lewis v. Accelerated*

---

9. Comment c to § 245 states:

"Whether or not an employment involves or is likely to lead to the use of force against the person of another is a question to be decided upon the facts of the individual case. To create liability for a battery by a servant upon a third person, the employment must be one which is likely to bring the servant into conflict with others. The making of contracts, or the compromise, settlement, or collection of accounts, does not ordinarily have this tendency. On the other hand, the employment of servants to guard or to recapture property, to take possession of land, or to deal with chattels which are in the possession of another, is likely to lead to altercations, and the master may become liable, in spite of instructions that no force shall be exerted against the person of the possessor."

*Express,* 219 Md. 252, 255, and *LePore v. Gulf Oil Corp.,* 237 Md. 591, 595. The first sentence was iterated in *Drug Fair v. Smith,* 263 Md. 341, 350, and emphasis added to the phrase "furtherance thereof, and were such as may fairly be said to be authorized by him." *Wood v. Abell,* 268 Md. 214, 227, repeated it as it was set out in *Drug Fair.* It is clear that it is the present law of this State. Concisely stated the test is whether the servant was advancing his master's interests in doing what he did at the time he did it.

It was early settled in Maryland that whether the act of the servant complained of is within the scope of his duty while acting in furtherance of his master's business is generally to be determined by the jury as a matter of fact and not by the court as a matter of law. *Consolidated Ry. Co. v. Pierce,* 89 Md. 495, 503, cited in *Deck v. Balto. & Ohio R. Co.,* 100 Md. 168, 182. There is a proviso, however. In *Drug Fair v. Smith, supra,* at 346-347, the Court of Appeals recognizing that "the issue of whether a servant is acting within the scope of his employment is ordinarily a question for the jury", added, "but this is so, only if there is a factual dispute." See *D. C. Transit System v. Brooks,* 264 Md. 578, 586. Where there is no conflict in the evidence relating to the question and but one inference can be drawn therefrom, the question is one of law for the court. *Globe Indemnity Co. v. Victill Corp.,* 208 Md. 573, 585.

## DECISION

There was manifestly no dispute as to certain of the facts. Davis was employed by Giant in the status of its servant. He was not assigned to the store in which the incident occurred nor was he on duty at the time it occurred. That Davis and Rusnack fought, the salient features of the struggle and the outcome were not in conflict, and, indeed, Rusnack's version was corroborated by other customers and the store manager. There are two areas in which it may be said a factual dispute existed, (1) Davis's authority while off duty to perform the services for which he was hired, and (2) what precipitated the fight. But no matter how a jury resolved those factual disputes, the evidence would still be legally insufficient to

establish Giant's liability. Even if Davis were authorized to guard his employer's property and keep the peace while off duty in a store to which he was not assigned to work, and no matter which version of the circumstances leading to the fight is accepted as true, the evidence was not sufficient in law to permit a jury to find that Davis's presence in the store and his acts with respect to Rusnack were in any way actuated by a purpose to serve his master. The only reasonable inference from the evidence is that he was in the store on personal business — as a customer to make some purchases. He had made them and was in the process of getting in the checkout line to pay for them. Whether Davis was then bumped inadvertently by Rusnack and immediately assaulted and beat Rusnack, as Rusnack said, or whether Davis upon being purposely bumped and struck by Rusnack, acted in self-defense, as Davis indicated, the result is the same. No matter which version is accepted as correct, it cannot be fairly said that Davis was advancing Giant's interests in doing what he did at the time he did it. In short, the evidence was not legally sufficient to show that his acts were within the scope of his employment, done while prosecuting Giant's business in furtherance thereof so as fairly to be said to have been authorized by Giant. There was nothing to show that the actions of Davis were incident to the performance of the duties entrusted to him by Giant. The only reasonable inference from the evidence is that Davis's motivation was solely and exclusively personal, not related to his position as an employee of Giant. His act was unexpectable in view of his duties. If it was done as Rusnack said, it was outrageous, indicating that Davis merely used the opportunity afforded by the circumstances to do harm. If it was done as Davis said, it was not even tortious. In neither case was there evidence of an intent on Davis's part to serve his employer. Giant violated no personal duty to Rusnack and was not liable in the circumstances for Davis's act.[10]

---

**10.** That the manager told a customer during the altercation that Davis was a store detective making an arrest, and that someone told another

We hold that the trial court did not err in directing a verdict in favor of Giant at the close of all the evidence.

*Judgment affirmed; costs to be paid by appellant.*

---

customer that Davis was a "security man" did not put liability for Davis's act on Giant. As we have indicated, the manager did not know what precipitated the fight, but did know that Davis was in Giant's employ as a security officer. This in no sense was a ratification of Davis's act so as to bjnd Giant. See Restatement (Second) of Agency § 218 (1958); Globe Indemnity Co. v. Victill, *supra.*